USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___4/3/2026___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

ELDER LEODANI VASQUEZ SALGADO,       :
                            :
                 Petitioner,     :
                            :
           -against-      :
                            :          25-CV-6524 (VEC)
LADEON FRANCIS, Acting Field Office    :
Director, US Immigrations and Customs   :        OPINION AND ORDER
Enforcement, KRISTI NOEM, U.S. Secretary of  :
Homeland Security, TODD LYONS, Acting   :
Director U.S. Immigrations and Customs    :
Enforcement, and PAM BONDI, Attorney     :
General, *in their official capacities*,       :
                            :
               Respondents.   :
                            :

------------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Elder Leodani Vasquez Salgado (who goes by "Sheila Bracamontes") ("Petitioner")

originally filed this habeas action pursuant to 28 U.S.C. § 2241 challenging the Government's

efforts to detain and remove her.[1]  *See generally* Petition for Writ of Habeas Corpus, Dkt. 4.

Petitioner is a transgender woman[2] from Honduras who suffers from a myriad of mental health

issues, stemming in part from repeated attacks she suffered in Honduras due to her gender

identity.  *See* Second Amended Petition for Writ of Habeas Corpus, Dkt. 46 ("Second Amended

Petition" or "SAP"), ¶¶ 1–2, 4.  Petitioner previously moved, *inter alia*, for release pending

adjudication of her habeas claims, *see* Amended Petition for Writ of Habeas Corpus, Dkt. 22; the

---

[1]      The individual Defendants are LaDeon Francis, Acting Field Office Director of U.S. Immigrations and Customs Enforcement ("ICE"), Kristi Noem, former-U.S. Secretary of Homeland Security, Todd Lyons, Acting Director of ICE, and Pam Bondi, former-U.S. Attorney General, all in their official capacities (collectively, the "Government").

[2]      Petitioner uses "she/her" pronouns.  The Court uses Petitioner's preferred pronouns throughout this order.

Court granted that motion on October 1, 2025, *see* Dkt. 40.  Now before the Court is Petitioner's

Second Amended Petition, which requests that the Court permanently enjoin the Government

from detaining Ms. Bracamontes, or, in the alternative, that the Court retain jurisdiction of the

case, order that Petitioner not be re-detained without notice and an opportunity to be heard, and

require that, prior to any detention, the Government demonstrate its ability to provide custody

accommodations suitable to meet Ms. Bracamontes's various medical and mental health needs.

*See* SAP ¶¶ 10–11.  For the following reasons, Petitioner's Second Amended Habeas Petition is

GRANTED in part and DENIED in part.

BACKGROUND[3]

**I.    Factual Background**

In June 2021, a Border Patrol Agent with U.S. Customs and Border Protection ("CBP")

encountered Petitioner near Hidalgo, Texas, and, upon determining that she had unlawfully

entered the United States, took her into custody to await formal processing.  Zanello Decl., Dkt.

33 ¶ 6.  On June 17, 2021, CBP served Petitioner with a Notice and Order of Expedited Removal

reflecting the Department of Homeland Security's ("DHS") then-determination that she crossed

the border without the documentation necessary to enter or remain in the United States and was

thus inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(I).[4]  *Id.* ¶¶ 6–8.  On June 20, 2021,

Petitioner was transferred to U.S. Immigration and Customs Enforcement ("ICE") custody,

where she remained until July 4, 2021.  *Id.* ¶¶ 9–11.  On July 4, she was released into the United

---

[3]    The facts are taken from the Second Amended Petition, the parties' briefs, the declarations submitted by the Government, and all exhibits thereto.

[4]    Section 1182(a)(7)(A)(i)(I) deems inadmissible "any immigrant . . . who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 1181(a) of this title."

2

States on humanitarian parole pursuant to section 212(d)(5) of the Immigration and Nationality Act ("INA") of 1952, 8 U.S.C. § 1182(d)(5)(A), following Petitioner's expressed fear of being returned to Honduras.[5]   Zanello Decl. ¶¶ 9–11; *see also* Gov't Opp., Dkt. 51, at 8 ("Petitioner . . . was promptly apprehended after unlawfully crossing the border, and [] was expressly released on humanitarian parole under 8 U.S.C. § 1182(d)(5)(A).")  Upon her release from ICE custody, Petitioner provided the Government with a mailing address in Norcross, Georgia.  Zanello Decl. ¶ 11.  Petitioner's grant of humanitarian parole automatically expired after one year (in July 2022), absent a discretionary extension by ICE.  Dkt. 45-1 at 1 (Interim Notice Authorizing Parole).

On August 24, 2021, Petitioner was issued a Notice to Appear ("NTA") charging her with inadmissibility as an alien present in the United States without being admitted or paroled, or who arrived in the United States at a time or place other than as designated by the Attorney General.  Zanello Decl. ¶ 12.  On September 14, 2021, ICE filed the NTA with the Executive Office for Immigration Review and advised Petitioner to appear for a hearing before an Immigration Judge in Atlanta, Georgia, on December 30, 2021.  *Id.* ¶ 13.  According to the Government, no such hearing was held.  *Id.*

---

[5]    The Government's decision to release Petitioner into the United States on humanitarian parole was not unusual.  Congress has fashioned the country's immigration laws such "that persons who arrive at the border without documents are not categorically ineligible for release."  *Qasemi v. Francis*, No. 25-CV-10029 (LJL), 2025 WL 3654098, at *13 (S.D.N.Y. Dec. 17, 2025) (slip op.).  "[Congress] gave immigration officers the authority on a 'case-by-case basis' to release a person arriving without documents into the community 'for urgent humanitarian reasons or significant public benefit' where that person presented neither a risk of flight nor a danger to the community."  *Id.* (quoting 8 U.S.C. § 1182(d)(5)(A)).  As such, the Executive Branch has long "exercise[d] its discretion to temporarily allow into the United States noncitizens who are applying for admission to the country instead of holding them in detention."  *Coal. for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48, 64 (D.D.C. 2025); *see also, e.g.*, *Biden v. Texas*, 597 U.S. 785, 814–15 (2022) (Kavanaugh, J., concurring) ("Notably, every administration beginning in the late 1990s has relied heavily on the parole option [under 8 U.S.C. § 1182(d)(5)(A)], including the administrations of Presidents Clinton, Bush, Obama, Trump, and Biden.").

More than three years later, on April 8, 2025, the Immigration Court in Atlanta issued a hearing notice rescheduling Petitioner's initial master calendar hearing for October 5, 2026. *Id.* ¶ 14. Having moved to New York City in 2024, Petitioner promptly requested that the venue of her immigration proceedings be moved from Atlanta to the New York Immigration Court. *Id.* ¶ 15. Her request was granted on May 29, 2025. *Id.* ¶ 16. On June 2, 2025, the New York Immigration Court issued a hearing notice rescheduling the initial master calendar hearing for April 15, 2026. *Id.* ¶ 17. As far as the Court is aware, that master calendar date remains on the books.

Since arriving in New York City, Petitioner has received a wide range of vital services, including medical, mental health, and gender-affirming care. SAP ¶¶ 26–28, 39–40; *see also* Dkts. 46-2 (Ex. A), 46-5 (Ex. D), 46-6 (Ex. E), 46-7 (Ex. F), 46-9 (Ex. H). Petitioner has also had a few encounters with law enforcement. On November 8, 2024, Petitioner pled guilty to Disorderly Conduct, a Violation under New York Penal Law § 240.20. Joyce Decl., Dkt. 53 ¶ 14. On July 11, 2025, Petitioner was arrested by the New York City Police Department ("NYPD") and charged with Attempted Assault in the Second Degree, a Class E felony, Obstructing Governmental Administration in the Second Degree, a Class A misdemeanor, and Attempted Assault in the Third Degree, a Class B misdemeanor. *Id.* On July 18, 2025, Petitioner was arrested and charged with Assault in the Third Degree, a Class A misdemeanor, and Harassment in the Second Degree, a Violation.[6] *Id.* Each of the charges has since been reduced or dismissed. *See* Pet. Reply, Dkt. 54 at 3; *see also* Dkts. 54-2 (Ex. B), 54-3 (Ex. C).

On or about May 1, 2025—after Petitioner had pled guilty to Disorderly Conduct but before her arrests in July on more serious charges—Petitioner submitted an asylum application

---

[6]      For each arrest, the State of New York chose not to detain Petitioner. *See* Pet. Reply, Dkt. 54 at 8.

based on her fear of being deported to Honduras.  SAP ¶ 30.  On July 11, 2025, following

Petitioner's arrest by the NYPD, ICE filed a Form I-274A Immigration Detainer and prepared a

Form I-200 Warrant for Petitioner's Arrest.  Zanello Decl. ¶ 25.  On the same day, ICE issued a

Form I-200 Warrant for Arrest of an Alien.  Joyce Decl. ¶ 12.  On July 24, 2025, ICE emailed

Petitioner's counsel asking Petitioner to appear for a "check-in" at 26 Federal Plaza, New York,

New York.  Zanello Decl. ¶¶ 26–27.  When Petitioner reported as requested on August 7, 2025,

ICE arrested her and held her at 26 Federal Plaza.  *Id.* ¶ 27; Joyce Decl. ¶ 14.[7]

Petitioner was held at 26 Federal Plaza until August 10, 2025, when she was transferred

to New York Presbyterian Hospital after expressing suicidal ideation.  Joyce Decl. ¶¶ 16–17.[8]

On October 1, 2025, Petitioner was discharged from New York Presbyterian and briefly re-

detained by ICE before being released from custody pending resolution of her habeas petition in

accordance with a previous order of this Court.  *Id.* ¶ 18; *see also* Dkt. 40.

## II.    Procedural History

Petitioner's habeas petition, as filed on August 8, 2025, challenged both Petitioner's

detention and proposed removal, *see* Dkt. 4 ¶¶ 37–48, in addition to seeking release pending

---

[7]    According to the Government, "a custody redetermination was made"—although, it is unclear when and by whom.  Zanello Decl. ¶ 27.  The Government has since stated that, "at the time of [Petitioner's] detention" in August 2025, "ICE assessed Petitioner as 'high-risk,'" Joyce Decl. ¶ 14.  It further contends that "ICE would still today classify Petitioner as a high-risk detainee" due to the "violent nature of [Petitioner's] multiple arrests in the span of a single week in July [2025]," "Petitioner's erratic, disorderly, an uncontrolled conduct while in ICE detention— which involved throwing objects at ICE personnel and contractors, verbal harassment, insults, and deliberately exposing genitalia to ICE personnel and other detainees," and "Petitioner's admitted heavy drug use."  *Id.* ¶¶ 21–24.

[8]    As the Court has previously noted, *see* Dkt. 40 at 4 n.4, it appears that Petitioner consented to hospitalization.  The Government has represented that she was not involuntarily committed and that, for much or all of her stay, she was not in ICE custody.  Dkt. 27 at 2.  Because she remained in the Hospital for approximately six weeks, the Court assumes that she consented to hospitalization and that her mental health needs were substantial. *See Inpatient Psychiatric and Mental Health Care*, UCHICAGO MED., https://www.uchicagomedicine.org/conditions-services/psychiatry-and-psychology/inpatient-psychiatric-care (last visited Mar. 30, 2026) (average stay for inpatient psychiatric treatment at University of Chicago Medicine is five to seven days); *Inpatient Psychiatry at Tisch Hospital*, NYU LANGONE HEALTH, https://nyulangone.org/care-services/inpatient-psychiatry-at-tisch-hospital (last visited Mar. 30, 2026) (average stay for inpatient psychiatric treatment at NYU Langone Hospital is seven to eight days).

adjudication and an order prohibiting her removal from the Southern District of New York, *id.* ¶¶ 49–53. The same day, the Court issued an order prohibiting the Government from removing Petitioner from this District. *See* Dkt. 9. As previously noted, Petitioner remained either in ICE custody or hospitalized from August 7, 2026, through October 1, 2026, until she was released pursuant to this Court's order, pending adjudication of her habeas petition. SAP ¶ 5.

On October 31, 2025, Petitioner filed the Second Amended Petition, *see* Dkt. 46, alleging that the Government "continue[s] to pursue detention of Petitioner even though she has pending immigration removal proceedings in which she is seeking humanitarian based relief, notably asylum, withholding of removal under Immigration and Nationality Act [] 241, and for both withholding of removal and deferral of removal under the Convention Against Torture[.]" *Id.* ¶ 6. The Second Amended Petition does not challenge whether Petitioner can ultimately be removed from the United States but requests an order from the Court, consistent with the requirements of 8 U.S.C. § 1226(a) ("Section 1226(a)"), preventing the Government from re-detaining Petitioner during the pendency of her removal proceedings. *Id.* ¶¶ 9–10. Alternatively, Petitioner requests that the Court retain jurisdiction of her case and preclude the Government from re-detaining Petitioner absent "clear and convincing evidence that Petitioner is a flight risk and/or a danger to the community," and until the Government "demonstrate[s] that [it] can provide the accommodations that are necessary to ensure that Petitioner does not decompensate" if re-detained. *Id.* ¶ 11.[9] Petitioner separately requests leave to make a motion to take discovery. *See* Dkt. 47.

---

[9]    Petitioner argues that she is not subject to mandatory detention under 8 U.S.C. § 1225(b), and thus her immediate re-detention would violate her substantive and procedural due process rights because: (i) she is neither a danger to the community nor a flight risk, SAP ¶¶ 66–74; (ii) detaining her in an all-male facility and without access to hormone therapy constitutes deliberate indifference to her medical needs, *id.* ¶¶ 75–81; and (iii) she was detained without notice, explanation or an opportunity to be heard, *id.* ¶¶ 82–86. Petitioner also alleges violations of Section 504 of the Rehabilitation Act and its implementing regulations, 29 U.S.C. § 794; 6 C.F.R. § 15.30 *et seq.*; 28 C.F.R.

6

The Government opposes the Second Amended Petition, arguing that Petitioner's detention is permissible (indeed, obligatory) under 8 U.S.C. § 1225(b)(2)(A) ("Section 1225(b)(2)(A)"), which provides that "an alien who is an applicant for admission . . . shall be detained" pending removal proceedings "if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted." *See generally* Gov't Opp. The Government also opposes Petitioner's letter motion seeking additional discovery. *See* Dkt. 52.

## LEGAL STANDARD

Petitioner brings her Second Amended Petition pursuant to, *inter alia*, 28 U.S.C. § 2241. *See* SAP ¶ 17. A court shall not grant a writ of habeas corpus pursuant to Section 2241 unless the petitioner is "in custody." 28 U.S.C. § 2241(c). The requirement that the petitioner be in custody is a "jurisdictional prerequisite" for the issuance of the writ. *Simmonds v. I.N.S.*, 326 F.3d 351, 354 (2d Cir. 2003). The "in custody" determination is made at the time the Section 2241 petition is filed. *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968). Once the jurisdictional prerequisite of custody is met, jurisdiction cannot be defeated by the petitioner's subsequent release from custody while the petition is pending. *Id.*

The Government does not contest that Petitioner was in custody when her original habeas petition was filed, nor does it contest that Petitioner was immediately re-detained following her discharge from New York Presbyterian and released, per order of this Court, pending adjudication of her habeas petition. Therefore, although Petitioner is no longer physically within ICE's custody, she has satisfied Section 2241's "in custody" requirement. The Court has jurisdiction to decide Petitioner's Second Amended Petition.

---

§ 39.130 *et seq.*, and the Administrative Procedure Act for failing to comply with those provisions of the Rehabilitation Act. SAP ¶¶ 87–122.

DISCUSSION

The threshold question before the Court is which statute governs Petitioner's detention (both past and future): Section 1225(b)(2)(A) or Section 1226(a)?[10]  "The distinction is meaningful as detention under the former is, with few exceptions not present here, mandatory, while detention under the latter is discretionary and, in fact, provides [noncitizens] the right to a hearing in front of an immigration judge to determine if release is appropriate." *Sharifzoda v. Orange Cnty. Jail*, No. 26-CV-02486 (KMK), 2026 WL 851378, at *1 (S.D.N.Y. Mar. 27, 2026) (slip op.) (citing *Tumba v. Francis*, No. 25-CV-8110, 2025 WL 3079014, at *2 (S.D.N.Y. Nov. 4, 2025)).

The Government's position is that Petitioner "is an applicant for admission" under Section 1225(b)(2)(A) and became subject to mandatory detention at any time and without notice when her humanitarian parole expired in July 2022.  *See* Gov't Opp. at 8–12.  Put differently: as soon as Petitioner's parole ended, and notwithstanding that she (i) had been lawfully released *into* the United States a year earlier, and (ii) has *remained* in the United States since arriving in 2021, her legal status automatically reverted back to the status she had at the moment she was encountered near the border in Hidalgo, Texas.  *Id.*  Thus, the Government argues, Petitioner's detention is obligatory, because she has not "effected an entry" into the United States and should be "deemed an applicant for admission" under Section 1225 and "treated for constitutional purposes as if stopped at the border."  Gov't Opp. at 11 (quoting *Dep't of Homeland Sec. v.*

_____

[10]    Petitioner contends that she "was likely detained under the Laken Riley Act, 8 U.S.C. § 1226(c)(1)(E)," *see* Pet. Reply at 1, but that the Government has "failed to meet the requirements pursuant to that statute," *see* SAP ¶ 48. Nor, according to Petitioner, is she "subject to mandatory detention under 8 U.S.C. § 1225(b)," *id.* ¶ 49, as "she [is] no longer seeking admission" to the United States, given that "she [is] already in the country and [has] been living here for several years." Pet. Reply at 4.  Thus, Petitioner asserts that she can only be detained pursuant to Section 1226(a), if at all. *Id.* ¶ 50.  The Government seems to concede that the Laken Riley Act does not govern here and argues only that detention is required under Section 1225(b)(2)(A), as opposed to Section 1226(a). *See* Gov't Opp. at 8–13.

8

*Thuraissigiam*, 591 U.S. 103, 104–05 (1959)).

The Court disagrees. The overwhelming, "broad consensus among courts in the Second Circuit and across the country" is that Section 1226(a)—not Section 1225(b)(2)(A)—"governs cases such as this, where the noncitizen has been present in the United States for a long period of time." *Sharifzoda*, 2026 WL 851378, at *1; *see also Cardenas v. Almodovar*, No. 25-CV-9169, 2025 WL 3215573, at *1–2 (S.D.N.Y. Nov. 18, 2025) (collecting cases, noting "scores of decisions" on "the [Section] 1226(a) side of the split"); *Qasemi v. Francis*, No. 25-CV-10029 (LJL), 2025 WL 3654098, at *11–12 (S.D.N.Y. Dec. 17, 2025) (slip op.) (collecting cases); *Tumba*, 2025 WL 3079014, at *2 (same); *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 483–485 (S.D.N.Y. 2025) (same).

The Government's position—that "Petitioner remains an applicant for admission, notwithstanding Petitioner's prior release on humanitarian parole," *see* Gov't Opp. at 11 n.4—is, in a word, poppycock. It is also grossly discordant with the deluge of decisions rendered in recent habeas cases[11] that have flooded courts nationwide, as well as the plain meaning of Section 1182(d)(5)(A). The humanitarian parole statute's relevant clause directs that, at the expiration of a noncitizen's parole, the parolee "shall forthwith return or be returned to the custody from which [she] was paroled." 8 U.S.C. § 1182(d)(5)(A). The Supreme Court has confirmed that "nothing in [Section 1182(d)(5)(A)'s] text . . . affirmatively authorizes detention," so the statute cannot be read to independently authorize a parolee's confinement following the expiration of her parole. *Clark v. Martinez*, 543 U.S. 371, 385 (2005). "To the contrary, the Supreme Court has stressed, Section 1182(d)(5)(A) provides that, when parole is revoked or expires the noncitizen will be returned to the 'custody from which he was paroled and

---

[11]      *See, e.g.*, SAP ¶ 49 n.5 (collecting cases).

9

thereafter *his case shall continue to be dealt with in the same manner as that of any other applicant for admission.*'" *Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274, 302 (E.D.N.Y. 2025) (emphasis in original) (quoting *Clark*, 543 U.S. at 385) (cleaned up).

Any other applicant for admission who had resided in the United States for more than four years and was arrested on a Form I-200 warrant issued pursuant to Section 1226(a),[12] like Petitioner, would be subject to detainment under the provisions of Section 1226. *See, e.g., id.* at 305–06 ("[B]ased on the ordinary meaning of the plain text of [Section 1225], [petitioner] is not an 'arriving alien,' and therefore her detention does not fall under Section 1225(b)(1)(A)(i)" where petitioner was initially granted humanitarian parole into the United States but remained in the country for three years after the expiration of her parole and was arrested pursuant to Section 1226(a) arrest warrant)); *Qasemi*, 2025 WL 3654098, at *11 ("[T]he termination by expiration of [petitioner's humanitarian] parole returned him to the 'custody' of DHS pursuant to the INA. Because he was paroled, and because he is not an arriving alien, he is no longer subject to [] mandatory detention [under Section 1225.] . . . [A]bsent ongoing parole status, Section 1182 mandates that [petitioner] be treated just as the INA would treat any noncitizen previously granted parole and living in the United States."); *Tumba*, 2025 WL 3079014, at *3 (Section 1226 "governs the process of arresting and detaining non-citizens who have already entered the United States pending their removal" (alterations omitted) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018))); *Lopez Benitez*, 795 F. Supp. 3d at 484 ("'[O]nce inside* the United States *. . . an alien present in the country* may still be removed' under Section 1226." (emphasis in original) (quoting *Jennings*, 583 U.S. at 288)).[13]

---

[12]    *See* Dkts. 45-4, 45-5.

[13]    A handful of recent cases seem to imply that the analysis is somehow different if a noncitizen was originally paroled for humanitarian reasons under Section 1182(d)(5)(A) as opposed to released under her own

Hundreds of district courts decisions have rejected the "entry fiction" narrative that the Government peddles here—and for good reason. At no point since Petitioner's parole expired in 2022 has the Government treated her as anything but a noncitizen whom the Government has allowed to reside in the interior of the United States (as opposed to as an applicant actively seeking admission into the country). The Government made no "forthwith" attempt to "return [Petitioner] to the custody from which she was paroled" after her limited grant of parole expired in 2022. 8 U.S.C. § 1182(d)(5)(A). Nor has any Government official compellingly articulated that the humanitarian reasons and public benefit that supported Petitioner's initial release[14] no

---

recognizance pursuant to Section 1226(a). *See, e.g.*, *Villegas ex rel Guzman Andujar v. Francis*, No. 25-CV-09199 (JLR), 2025 WL 3215597, at *5 (S.D.N.Y. Nov. 18, 2025); *Sidqui v. Almodovar*, No. 25-CV-9359 (VSB), 2026 WL 251929, at *6–7 (S.D.N.Y. Jan. 30, 2026) ("Petitioner's release on parole, and not the humanitarian parole in § 1182(d)(5)(A), 'constitutes strong evidence' that he was released under § 1226(a) and not under § 1225(b).").

This Court disagrees that any such distinction can (or should) be drawn and, along with many of its sister courts, is firmly of the view that, under the circumstances present here, Petitioner is no longer an "arriving" noncitizen; the mechanism by which she was originally paroled is irrelevant. *See, e.g.*, *Qasemi v. Francis*, No. 25-CV-10029 (LJL), 2025 WL 3654098, at *10–11 (S.D.N.Y. Dec. 17, 2025) (slip op.) ("[Section] 1182(d)(5)(A) does *not* state that a noncitizen is returned to the 'status' they held upon their parole, that they revert to status as an 'arriving alien,' or that they must be detained." (emphasis in original)); *Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274, 302–05 (E.D.N.Y. 2025) ("[A]fter Respondents paroled [petitioner] into the United States under Section 1182(d)(5)(A), they treated her as a noncitizen subject to Section 1226 and not as a noncitizen subject to mandatory detention under any of the applicable provisions of Section 1225(b)" and thus, Section 1225(b)(2) does not govern petitioner's detention); *Coal. for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48, 90 (D.D.C. 2025) (holding that § 1225(b) "does not authorize designation for expedited removal of any noncitizen who has, at any point in time, been paroled into the United States"); *Aviles-Mena v. Kaiser*, No. 25-CV-06783 (RFL), 2025 WL 2578215, at *5 n.5 (N.D. Cal. Sept. 5, 2025) ("The automatic termination of [humanitarian] parole does not give the government *carte blanche* to re-detain a non-citizen where no valid statutory purpose is served."); *Khubiev v. Baltasar*, No. 25-CV-03955 (STV), 2026 WL 864237, at *5–6 (D. Colo. Mar. 30, 2026) (slip op.) ("Although Petitioner's [humanitarian] parole expired in July 2022, DHS permitted him to reside in the United States for several years thereafter[.] . . . His detention therefore does not arise from any ongoing entry or inspection process[.] . . . In that posture, detention is properly understood as detention 'pending a decision on whether the alien is to be removed,' which falls within Section 1226(a), notwithstanding Petitioner's initial classification at the time of entry." (internal citations omitted)); *Xu v. Bondi*, No. 26-CV-1765 (GPC) (DEB), 2026 WL 836667, at *5 (S.D. Cal. Mar. 26, 2026) (slip op.) ("Petitioner is no longer an 'arriving' noncitizen after having resided here for over three years. In addition, beyond the fact that he has been present in this country for a [three]-year period, he also has been paroled [under Section 1182(d)(5)(A)] into the United States. Therefore, the Court finds that Petitioner could not be subject to [Section] 1225.").

[14]    When DHS released Petitioner on humanitarian parole in 2021, it presumably did so after a finding, as is required by DHS regulations, that Petitioner "present[ed] neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b).

longer exist.[15]  As the Court previously noted, the two I-200 warrants authorizing Petitioner's

arrest (in July and August 2025, respectively), state that Petitioner was to be detained pursuant to

Section 236 of the INA—which is codified at Section 1226.  *See* Dkts. 45-4, 45-5; *see also Perez*

*Agustin v. Joyce*, No. 25-CV-10122 (AT), 2025 WL 3564494, at *2 (S.D.N.Y. Dec. 12, 2025)

(slip op.) (petitioner detained under Section 1226 when arrest warrant is authorized pursuant to

Section 236 of INA); *Lopez Benitez*, 795 F. Supp. 3d at 485 (Government's exhibits

"unequivocally establish" petitioner detained under Section 1226 when warrant issued pursuant

to Section 236 of INA).  Petitioner is also correct that the Government's continued fixation with

Petitioner's recent criminal history tends to suggest that her detention may be based on the Laken

Riley Act, which is codified at 8 U.S.C. § 1226(C)(1)(E), and not on the provisions in Section

1225(b)(2)(A).  *See* Pet. Reply, Dkt. 54 at 2–3.[16]

In short, there is not a single iota of documentary evidence to support the Government's

contention that Petitioner's 2025 detention was pursuant to Section 1225(b)(2)(A), nor that her

re-detention is mandatory pursuant to the same.  When Petitioner was released on parole under

Section 1182(d)(5)(A), she was removed from the ambit of the mandatory detention regime

---

[15]    To the extent the Government argues that Plaintiff's recent arrests constitute a change in circumstances sufficient to modify ICE's previous parole calculus, *see* Joyce Decl. ¶¶ 20–24, the Court remains unconvinced.  The Court has acknowledged that "Petitioner's criminal history is by no means spotless," but, based on the evidence presented by both parties, there can be no serious contention that Petitioner's "past encounters with law enforcement are []frequent," nor that they are particularly egregious.  Dkt. 40 at 12 (internal citations omitted); *see also supra* p.4 (each of the charges relevant to the Government's risk-classification determination has since been reduced or dismissed).  It is also obvious that Petitioner's legal troubles are intertwined with, and perhaps a result of, the significant mental health challenges with which she continues to grapple.  "Allowing [Petitioner] to continue treatment is" at least "as effective at mitigating danger to the community as detaining her," if not more so.  Dkt. 40 at 12.  That Petitioner "has not caused any harm to others" "[s]ince [being] release[d] back into her community," Pet. Reply at 8, is also compelling evidence that continued treatment at the Ali Forney Center—and not detention by ICE—is far and away the most appropriate method of managing the risks that the Government contends Petitioner poses to herself and others.  *See* Joyce Decl. ¶¶ 12–24; Gov't Opp. at 7–8.

[16]    Notwithstanding any appeal that the argument may have had, the Government has abandoned its position that Petitioner is subject to mandatory detention under the Laken Riley Act.  *See supra* n.10.  *But see* Gov't Opp., Dkt. 51, at 4 n.2 (making passing reference to mandatory detention under the Laken Riley Act in footnote).

established in Section 1225.  The mere expiration of her parole does not return Petitioner to that world.  Thus, any determination as to Petitioner's detention at this point (*i.e.*, post-parole expiration) must be made under the discretionary framework of Section 1226(a).  Because noncitizens who are detained under Section 1226(a) must be afforded an initial determination as to their eligibility for release and the opportunity for a bond hearing upon detention, 8 C.F.R. § 1236.1(d)(1), and because Petitioner was afforded neither, her detention by ICE was in violation of Section 1226(a).

For the same reasons, Petitioner's re-detention during the pendency of her removal proceedings would, without notice and opportunity to be heard, violate Section 1226(a) and Petitioner's due process rights under the Fifth Amendment.  As the Court noted in its prior order, because Petitioner's detention is pursuant to Section 1226(a), Petitioner has an exceedingly strong claim that the discretionary process (or, lack thereof) that would result in her detention is constitutionally flawed.  *See* Dkt. 40 at 9 n.8.

All three factors set forth in *Matthews v. Eldridge* (*i.e.*, (i) Petitioner's private interest that is being affected, (ii) the risk of an erroneous deprivation of Petitioner's private interest, and (iii) the Government's interest) weigh decisively in Petitioner's favor.  *See* 424 U.S. 319, 335 (1976).  The Due Process Clause of the Fifth Amendment prevents the Government from depriving any person—including non-citizens, "whether their presence here is lawful, unlawful, temporary, or permanent," *Zadvydas v. Davis*, 553 U.S. 678, 693 (2001)—of "life, liberty, or property without due process of law."  U.S. Const. amend. V.  Here, "the private interest affected by the [Government's] action is the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez v. Decker*, 978 F.3d 842, 849 (2d Cir. 2020).  Next, because the Government (incorrectly) contends that Petitioner's detention is mandatory, it has

13

made little effort to show that it exercised any discretion when deciding whether Petitioner should be detained.[17]  There is, in short, a significant risk that the Government, if left to its own devices, will wrongfully deprive Petitioner of her protected liberty interest.  Finally, there is no dispute that the Government's interest in detention is justified if Petitioner is a danger to the community or a flight risk.  *See Zadvydas*, 533 U.S. at 690–91.  But Petitioner's limited (and, recently mitigated) criminal history and ties to the community, including those necessary for the maintenance of her medical and mental health and the provision of gender-affirming care, compel the Cout's conclusion that whatever risks she poses can be mitigated by measures well short of detention.  *See* Dkts. 46-2 (Ex. A), Dkt. 46-4 (Ex. C), 46-5 (Ex. D), 46-6 (Ex. E), Dkt. 46-7 (Ex. F), 46-9 (Ex. H); *see also supra* n.15.

Having determined that Petitioner's due process rights were violated (Counts I and III), and that she is entitled to a writ of habeas corpus on that basis alone, the Court will not address Petitioner's remaining arguments regarding the Administrative Procedure Act and the Rehabilitation Act (Count IV), nor her arguments that the Government was deliberately indifferent to her medical needs (Count II).

CONCLUSION

For the reasons stated above, the Petitioner's Second Amended Petition for a writ of habeas corpus is GRANTED in part.  It is hereby ORDERED that Petitioner shall not be re-detained by ICE without notice and an opportunity to be heard at a pre-deprivation bond hearing

---

[17]     Post hoc, the Government claims that Petitioner's risk classification is based on its purported assessment of "the totality of circumstances," including, for example, "any relevant information that may impact [Petitioner's] dangerousness or flight risk, including criminal history that has not resulted in convictions as well as any information regarding [Petitioner's] conduct in custody and information on [Petitioner's] drug use."  Joyce Decl. ¶ 20.  For the reasons stated throughout this opinion, the Government's cursory, after-the-fact compilation of rationales is alone insufficient to overcome the evidence tending to suggest (i) that Petitioner is not a danger to the community nor a flight risk, and (ii) that each of the stated rationales (and, particularly the latter two) is directly related to the mental health issues that Petitioner persuasively alleges the Government is ill-equipped to manage. *See supra* n.15.

before a neutral decisionmaker, where the Government will have the burden of showing that her detention is authorized under 8 U.S.C. § 1226(a).

It is further ORDERED that the Government is ENJOINED from denying bond to Petitioner in any subsequent proceedings on the ground that she must be detained pursuant to 8 U.S.C. § 1225(b)(2)(A) or 8 U.S.C. § 1226(c)(1)(E), absent a change in relevant circumstances.

Because Petitioner may not be re-detained without notice and opportunity to be heard, the Court concludes that Petitioner's claims challenging the conditions of her future detention are not yet ripe for adjudication. As such, those claims are DISMISSED without prejudice. Prior to the Government seeking to re-detain Petitioner pursuant to Section 1226(a) and consistent with this order, the Court strongly encourages the Government to assess carefully (i) whether the interests of Petitioner, the Government, and the community are best served by removing Petitioner from her current, stable situation, pending completion of her removal proceedings and, if so, (ii) whether it is positioned to provide accommodations adequate to reasonably ensure Petitioner's wellbeing during her detention.

Additional discovery in this case is not necessary at the current juncture. Petitioner's request for leave to make a motion to take discovery, *see* Dkt. 47, is, therefore, DENIED.

///

///

///

///

///

///

///

15

The Government did not address Petitioner's request for attorney's fees and costs pursuant to the Equal Access to Justice Act as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, in its opposition.  If Petitioner still intends on seeking such relief, the parties are directed to meet and confer and, not later than **Friday, April 24, 2026**, must file a joint letter via ECF proposing a briefing schedule for any application for attorney's fees and costs.


       **SO ORDERED.**

**Date:  April 3, 2026**
       **New York, New York**
                             **VALERIE CAPRONI**
                         **United States District Judge**